UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BENJAMIN ANDREW LAIGO, III,

                    Plaintiff,

          v.

KING COUNTY, et al.,

                    Defendants.

CASE NO. C16-1541-TSZ-MAT

REPORT AND RECOMMENDATION

INTRODUCTION

Plaintiff Benjamin Laigo proceeds pro se and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. While currently incarcerated at Coyote Ridge Corrections Center, plaintiff's claims relate to his medical issues and treatment while a pretrial detainee at King County Correctional Facility (KCCF).

The Court previously dismissed claims against Harborview Medical Center (HMC) provider Dr. Henry Sagi, but struck a motion for summary judgment filed by defendant King County without prejudice to refiling after submission of an amended pleading identifying Doe defendants. (*See* Dkts. 5, 31, 35, 65, 68, and 76.) In the Amended Complaint, plaintiff alleges

King County and thirty-nine individual King County employees, including KCCF Jail Health Services (JHS) staff, Department of Adult and Juvenile Detention (DAJD) transport officers, and King County Sheriff's Office (KCSO) employees, violated his constitutional rights through deficient medical treatment and transportation to treatment.  (Dkt. 79 at 1.)[1]  Plaintiff also submitted additional evidence supporting his claims.  (*See* Dkts. 144, 153.)

The King County defendants now again move for summary judgment.  (Dkt. 155.) Plaintiff did not respond to this dispositive motion.  For the reasons discussed below, the Court concludes Defendant King County's Second Motion for Summary Judgment should be granted and this action should be dismissed.

## BACKGROUND

The basic facts previously related in regard to plaintiff's claims remain the same. Following a November 8, 2015 head-on car collision, plaintiff was arrested at the scene and transported to HMC.  HMC provided treatment for dislocation and fracture of plaintiff's right hip, multiple rib fractures, and pneumonia.  On November 17, 2015, HMC discharged plaintiff to KCCF with prescriptions and a request for a follow-up appointment with HMC Orthopedics (HMC Ortho).  At intake, JHS staff confirmed plaintiff's prescriptions and discharge instructions with HMC, including an indication at that time to be non-weight bearing on the right leg.  JHS entered prescriptions for, *inter alia*, MS Contin (extended release morphine), oxycodone, acetaminophen, and gabapentin, provided plaintiff with a walker, wheelchair, and incentive spirometer for his lungs, scheduled a follow-up appointment at HMC, and moved plaintiff into the infirmary.  KCCF

---

[1] Plaintiff submitted two amended complaints.  (*See* Dkts. 78 & 79.)  Because the second document appears substantively the same as the first, but contains additional attachments, the Court herein addresses that document (Dkt. 79) as the operative amended pleading.

REPORT AND RECOMMENDATION
PAGE - 2

transferred plaintiff to the general population on November 24, 2015, after medical clearance by a physician and a fitting with crutches.

From the time of his intake through his December 6, 2016 transfer from KCCF, plaintiff saw medical staff at JHS and HMC on numerous occasions.  While he initially received opioid (narcotic) pain medications, JHS subsequently utilized a pain regimen incorporating a combination of non-opioid medications.  JHS modified plaintiff's use of assistive devices over the course of his treatment, providing for him to be non-touch down weight bearing on his right leg, then touch down weight bearing, and progressively more weight bearing.  While he received some transport via cabulance (wheelchair van) operated by an outside provider, DAJD transport officers otherwise transported plaintiff to and from HMC medical appointments.

In the currently pending dispositive motion and supportive declarations, defendants provide further detail regarding treatment plaintiff received from JHS and HMC, and other facts and circumstances associated with his treatment and confinement.  (*See* Dkts. 155, 157-159.)   The Court describes and addresses those details, as well as facts and evidence provided by plaintiff throughout this litigation, below and within the context of plaintiff's claims and defendants' arguments on summary judgment.

<u>DISCUSSION</u>

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the

REPORT AND RECOMMENDATION
PAGE - 3

nonmoving party's case." *Id*. at 325. The moving party can carry this burden by producing affirmative evidence negating an essential element of the nonmovant's case, or by establishing the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). A mere scintilla of evidence does not suffice to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party rely on allegations in the complaint or unsupported conjecture or conclusory statements. *Hernandez v.*

REPORT AND RECOMMENDATION
PAGE - 4

*Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

Plaintiff raises claims pursuant to 42 U.S.C. § 1983. In order to sustain a § 1983 claim, plaintiff must show (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state or federal law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Plaintiff must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981). The causation element may be satisfied by demonstrating a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act the person was legally required to do that caused the alleged deprivation of a constitutional right. *Id.* (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

A municipality or local government unit such as King County can be sued as a "person" under § 1983. *Monell v. Department of Social Servs. of City of New York*, 436 U.S. 658, 691-94 (1978). However, a municipality cannot be held liable under § 1983 solely because it employs a tortfeasor. *Id.* A plaintiff seeking to impose municipal liability must identify municipal "policy" or "custom" that caused his or her injury. *Bd. of the Cnty. Comm'rs of Bryant Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694). *See also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Liability may also exist where there is a "policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *City of Canton*, 489 U.S. at 388).

A.    <u>JHS Defendants</u>

Plaintiff avers JHS employees violated his constitutional rights through the denial of proper

REPORT AND RECOMMENDATION
PAGE - 5

medical treatment.  He names the following individuals as defendants:  Dr. Benjamin Sanders, Catherine Schroeder, Carolyn Michels, Loise Wanjohi, Christopher Derrah, Rodostina Decheva, Terra Bowles, Jennifer Jones-Vanderleest, Nancy Ledgerwood-VanVleck, Pamela Dunderdale, Tina Choe, Caryn Vertucci, Cynthia Kalka, Monica Manley, Marie Llantada, Michael Velasquez, Behauden Omer, Elaine Henriksen, Gabriela Diebate, SueAnne Brent, and Hayat Omer (hereinafter "JHS defendants" or "JHS staff").  (Dkt. 79 at 2.)

Because the conduct complained of occurred during plaintiff's confinement as a pretrial detainee, his rights derive from the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment's prohibition against cruel and unusual punishment.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  The Court applies a deliberate indifference standard in considering claims relating to medical care.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010), *overruled in part on other grounds in Castro v. County of Los Angeles*, 833 F.3d 1060, 1070-71 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 831, 97 L. Ed. 2d 69 (2017).  A prisoner or pretrial detainee must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle,* 429 U.S. at 106.  A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

Pursuant to recent Ninth Circuit law, the Court evaluates a pretrial detainee's Fourteenth Amendment claim alleging a violation of the right to adequate medical care under an objective deliberate indifference standard.  *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir.

2018) (citing *Castro*, 833 F.3d at 1070).[2]  A plaintiff must demonstrate: (1) the defendant made an intentional decision with respect to conditions under which the plaintiff was confined; (2) the conditions put plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable measures to abate the risk, "even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious;" and (4) by not taking such measures, the defendant caused plaintiff injury. *Id*. at 1125.

A "'mere lack of due care'" does not suffice to establish a constitutional violation. *Id*. (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)).  A pretrial detainee "must 'prove more than negligence but less than subjective intent – something akin to reckless disregard.'" *Id*. (quoting *Castro*, 833 F.3d at 1071).  *See also Estelle*, 529 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")  A difference of opinion between the inmate and medical authorities regarding proper treatment does not constitute deliberate indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981).  The delay of or interference with medical treatment for a serious medical need can amount to deliberate indifference.  *Jett*, 439 F.3d at 1096; *McGuckin*, 974 F.2d at 1059-60.  However, the inmate must show harm resulting from the delay.  *Id*.

Plaintiff avers deliberate indifference by the JHS defendants in depriving him of adequate pain medication, forcing him to bear weight on his injured leg before he received medical clearance

---

[2] Previously, "all conditions of confinement claims, including claims for inadequate medical care, were analyzed under a subjective deliberate indifference standard whether brought by a convicted prisoner under the Eighth Amendment or pretrial detainee under the Fourteenth Amendment." *Gordon*, 888 F.3d at 1122-23 (citing *Clouthier*, 591 F.3d at 1242-43).

to do so, failing to provide prescribed physical therapy or proper assistive devices, and denying him transport to HMC appointments in a wheelchair and by cabulance.   He maintains pain and injury resulting from this deliberate indifference to his serious medical needs.

While not disputing plaintiff's serious medical needs, defendants deny deliberate indifference in treatment.  JHS Medical Director Dr. Benjamin Sanders attests that, consistent with the HMC discharge instructions indicating plaintiff was to be non-weight bearing on his right leg, plaintiff was given both a walker and wheelchair upon his arrival at the KCCF infirmary, as well as prescribed antibiotics, a blood thinner, and oxycodone for pain.  (Dkt. 158, ¶¶8-10.)  JHS infirmary staff subsequently saw plaintiff on numerous occasions and prescribed, *inter alia*, MS Contin, a long-acting narcotic to be used in combination with the oxycodone for breakthrough pain, acetaminophen to be taken as needed, and gabapentin for nerve pain, and scheduled plaintiff for physical therapy and a follow-up HMC appointment.  (*Id*., ¶¶11-13.)

On November 19, 2015, JHS staff increased plaintiff's MS Contin dose to improve his pain control and, on November 20, 2015, plaintiff was reminded to remain non-weight bearing after reporting his ability to get up to use the shower and bathroom independently.  (*Id*., ¶¶12-13.)  When cleared for release to the general population on November 24, 2015, JHS staff fitted plaintiff with crutches and found him able to ambulate adequately and remain non-weight bearing on his right leg, prescribed Tylenol 3 (acetaminophen with codeine) to start when his oxycontin prescription expired on the following day, and ordered that he be housed in a lower bunk and lower deck.  (*Id*., ¶14.)  JHS also, at plaintiff's request, prescribed a wheelchair for transportation to court and visiting for thirty days.  (*Id*., ¶15.)

Plaintiff expressed dissatisfaction with his pain medication.  For example, on November 28, 2015, plaintiff reported inadequate relief from Tylenol 3 and requested more opiate pain

medication.  (*Id.*, ¶16.)  Staff observed plaintiff ambulating with crutches unassisted, and did not make any medication changes pending a scheduled HMC Ortho appointment.  At the HMC appointment on November 30, 2015, a doctor observed plaintiff's incision and fracture were healing with no issues, and indicated plaintiff should be touch down weight bearing on his right leg and that oxycodone should be considered for continued pain.  (*Id.*, ¶17.)  On his return to KCCF, plaintiff requested oxycodone, and JHS staff observed he ambulated independently on his crutches and scheduled a medical appointment.

Plaintiff repeated his reports of pain and requests for oxycodone in two appointments in early December 2015.  (*Id.*, ¶¶18-19.)  He appeared calm, in no apparent distress, self-propelling in a wheel chair, hyper-verbal, and focused on oxycodone.  JHS providers, on December 6, 2015, ordered acetaminophen to be given in addition to gabapentin for pain and, on December 10, 2015, ordered a ten-day prescription of oxycodone, with a follow-up scheduled in the clinic.  Plaintiff refused to go to the clinic appointment, staff advised him to kite if he wanted the appointment rescheduled, and he was referred to physical therapy.  (*Id.*, ¶20.)  He appeared for a subsequent triage appointment in a wheelchair, despite the HMC indication he should be touch down weight bearing.  (*Id.*, ¶21.)

Plaintiff also took issue with his transportation to and from HMC.  He refused transport to a December 28, 2015 HMC appointment without a wheelchair.  (*Id.*, ¶22.)  A cabulance had not been ordered and plaintiff did not attend the appointment.  A JHS provider showed plaintiff his chart indicating he was to be weight bearing since November 30, 2015, his HMC appointment was rescheduled, and JHS staff verified with transport staff plaintiff had been medically cleared to use crutches and did not need to be transported in a wheelchair.  At a January 4, 2016 HMC appointment, a doctor found plaintiff's range of motion and x-rays good, his wound healing nicely,

REPORT AND RECOMMENDATION
PAGE - 9

and recommended Tylenol for pain and range of motion exercises. (*Id.*, ¶23.) The doctor indicated plaintiff should continue to be touch down weight bearing through his six-week follow up and should be full weight bearing in approximately six weeks. Later that day, plaintiff informed JHS staff the HMC doctor had advised him to be non-weight bearing and that he intended to do as such for the next six weeks, while JHS staff informed plaintiff of the plan of care advised by HMC and prescribed both Tylenol and gabapentin.

On January 14, 2016, plaintiff reported to a JHS provider that, contrary to HMC advice, he no longer wanted to be on a blood thinner and had been full weight bearing. (*Id.*, ¶24.) He had run out of Tylenol prescribed to last another day. JHS staff observed plaintiff full weight bearing, with his crutches held out in front of him, and advised him to stop that practice and the Tylenol overuse. JHS also advised plaintiff could consider Advil (ibuprofen) from the commissary, but that HMC Ortho did not advise the use of non-steroidal anti-inflammatory drugs with a healing fracture, discussed exercise and appropriate level of activity, and refilled plaintiff's Tylenol prescription the following day.

On February 8, 2016, HMC Ortho advised plaintiff he could progress to weight bearing, as tolerated, weaning from two crutches to one, and then no assistive device, and recommended strengthening in physical therapy. (*Id.*, ¶25.) As recommended by HMC, JHS discontinued plaintiff's blood thinner and prescribed gabapentin and Tylenol for pain. In mid-February, JHS staff observed plaintiff using two crutches, advised him to start using one crutch and then move to a cane, and plaintiff admitted being weight bearing and doing leg manipulations prior to having medical clearance to do so. (*Id.*, ¶26.) Providers advised plaintiff to continue exercises as instructed by physical therapy and ordered Tylenol for pain. On a number of occasions in February and March 2016, plaintiff refused to take his gabapentin. (*Id.*, ¶27.) A doctor discontinued

REPORT AND RECOMMENDATION
PAGE - 10

gabapentin after a week, and plaintiff was advised to kite if he needed a follow-up appointment, told to go to triage after he filed a grievance regarding the gabapentin discontinuation, and prescribed Tylenol for pain.

On May 9, 2016, plaintiff reported pain in an HMC Ortho appointment and, while his x-rays looked good, there was concern about a fragment not healing.  (*Id.*, ¶28.)  The doctor recommended Tylenol for pain and physical therapy for improved strength, said Advil could be considered for muscle pain, and requested a six-month follow-up.  On his return to KCCF, staff observed plaintiff ambulating on one crutch, prescribed ibuprofen for pain, and told plaintiff he could get additional over-the-counter pain medication from commissary.

Plaintiff continued to report pain and received treatment from JHS on a number of occasions in September, October, and November 2016, before his transfer from KCCF on December 6, 2016.  Staff observed plaintiff ambulating with a cane, encouraged him to continue ambulation and stretches and to use ibuprofen and commissary pain medications, and referred him back to HMC Ortho.  (*Id.*, ¶¶29-31.)  During this time, providers also ordered higher doses of ibuprofen, restarted gabapentin, and twice adjusted the dose upward to aid in pain control.

The Court, as an initial matter, addresses the inclusion of Tina Choe and Caryn Vertucci as defendants.  Dr. Sanders attests his review of medical records shows neither Choe, nor Vertucci made any medical decisions relating to plaintiff.  (Dkt. 158, ¶37.)  Choe, a JHS pharmacist, helped to transfer plaintiff's prescription information from one electronic records system to another, while Vertucci, a JHS dentist, sent plaintiff a reverse kite following his failure to appear for a scheduled dental visit, informing plaintiff he could reschedule a dental examination through triage.  (*Id.*; *see also* Dkt. 153 at 103-04.)  Plaintiff does not set forth evidence contradicting this depiction or show either Choe or Vertucci personally participated in causing him harm.  Plaintiff's allegations against

these individuals should be dismissed. The Court further, and for the reasons discussed below, finds plaintiff's claims against the remaining JHS defendants subject to dismissal.

There is no dispute plaintiff had serious medical conditions resulting in pain, and that JHS provided plaintiff medication to treat his pain. Defendants show the provision of numerous pain medications, including oxycodone, morphine, gabapentin, ibuprofen, acetaminophen with codeine, and acetaminophen. They show the alteration of plaintiff's pain medication regimen on a number of occasions, when prompted by plaintiff's complaints or otherwise found medically necessary, including, but not limited to, a resumption of oxycodone for a ten-day period following a suggestion from HMC it could be considered for pain relief. (*See* Dkt. 158, ¶¶17-19.) Dr. Sanders identifies differences between prescriptions verified for use outside of jail and orders placed in jail, including those for opioid (narcotic) pain medications, due to security and operational aspects of correctional facilities. (*Id*., ¶33.) He attests to the medically appropriate decision to initially treat plaintiff with opioid pain medications and to slowly taper off to pain management with a combination of non-opioid pain medications.

Plaintiff does not identify evidence showing he was deprived of medically necessary pain medication. Instead, both his allegations and the evidence show he disagreed with JHS staff as to the necessary and appropriate types and amounts of medication. A medical decision to choose one pain medication over another, or to alter doses of prescribed medications, does not amount to deliberate indifference. *See Franklin*, 662 F.2d at 1345 (difference of opinion between inmate and medical authorities regarding proper medical treatment does not give rise to a constitutional violation). Nor does a mere delay in the provision of medication or other treatment, without more, suffice to show deliberate indifference. *See, e.g.*, *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990) (no deliberate indifference when inmate did not receive any pain medication for a

broken shoulder for several days because the "condition did not require emergency attention" and the delay did not substantially harm his treatment). *Cf. O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains not a constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice, but do not rise to level of unnecessary and wanton infliction of pain). Because plaintiff does not present significant, probative evidence demonstrating any of the JHS defendants made an intentional decision regarding his medication that put him at risk of suffering serious harm, failed to take reasonable measures to abate that risk, and caused him injury, he fails to show deliberate indifference.

The evidence associated with plaintiff's weight bearing on his right leg, assistive devices, and modes of transportation likewise fails to support a claim of deliberate indifference. JHS provided plaintiff with a wheelchair, walker, crutches, and cane. Defendants describe plaintiff's progression from non-weight bearing, to touch down weight bearing as of November 30, 2015, and progressively weight bearing beginning February 8, 2016, weaning from two crutches, to one crutch, a cane, and ultimately no assistive device, all in accordance with HMC Ortho recommendations. (*See*, *e.g.*, Dkt. 158, ¶¶17, 25.)

The evidence shows that, prior to the November 30, 2015 clearance, plaintiff could ambulate adequately with crutches and remain non-weight bearing on his right leg. (*Id.*, ¶¶14-15.) After the clearance to touch down weight bearing, JHS staff observed plaintiff ambulating independently on his crutches, sitting and standing unassisted, and without any observed distress. (*Id.*, ¶13.) While plaintiff, in December 2015, appeared for appointments in a wheelchair and refused transport to an HMC Ortho appointment without a wheelchair and cabulance, Dr. Sanders attests a wheelchair was not medically necessary. (*Id.*, ¶¶35-36.) He explains the late November

REPORT AND RECOMMENDATION
PAGE - 13

2015 decision to grant plaintiff's request for thirty days use of a wheelchair for court hearings and visitation as owing to efficiency of transport, not medical necessity. Dr. Sanders further attests inmates are not regularly transported to medical appointments in a cabulance, and that a cabulance is only necessary for individuals who must utilize a wheelchair or gurney for transportation. (*Id.*, ¶36.) He notes the absence of any evidence in the medical record of an injury that occurred during plaintiff's transport.

Plaintiff differs in his understanding of the plan for his injured leg. He alleges, for example, Dr. Sanders lied about the ability to be "*full* weight bearing" since November 30, 2015, and then "changed his story" in stating plaintiff could, as of February 8, 2016, progress to weight bearing. (Dkt. 79 at 46 (emphasis added).) He contends his ability to progress to weight bearing was contingent on weaning in physical therapy, and that the record shows he did not "even receive a partial-weight bearing physical-therapy until February 8, 2016." (*Id.* at 46-47.) The evidence supports defendants' depiction of events. For example, in late December 2015, plaintiff filed a grievance complaining JHS was requiring him to put weight on his right leg contrary to HMC direction to not put "<u>any</u> weight on it." (Dkt. 153 at 41 (emphasis in original).) The response, consistent with the declaration of Dr. Sanders, shows a JHS staff member reviewed plaintiff's chart, showed plaintiff the plan from the HMC Ortho doctor, and that plaintiff was "given a crutch to use, which is medically indicated at this time of your healing process." (*Id.*; Dkt. 158, ¶22.)

Plaintiff does not present significant, probative evidence showing the JHS defendants forced him to bear weight on his injured leg before he received medical clearance to do so, or deprived him of medically necessary assistive devices or transport. As with his medications, the difference of opinion between plaintiff and medical providers in regard to weight bearing, assistive devices, and modes of transport does not amount to deliberate indifference. The evidence also

reflects plaintiff, on more than one occasion, deviated from the prescribed plan of care for his mobility, contrary to medical advice of HMC and JHS.  Moreover, even if it could be said decisions made with regard to assistive devices and transportation put plaintiff at risk of suffering serious harm and that the JHS defendants failed to take reasonable measures to abate that risk, plaintiff does not demonstrate he suffered harm.  As described below, the only evidence of a complaint associated with transport is a medical grievance dated October 11, 2016 (*see* Dkt. 158, Ex. A), submitted after plaintiff initiated this lawsuit and almost a year after the time period when he could not bear any weight on his injured leg.

Plaintiff also alleges the JHS defendants deprived him of physical therapy.  As set forth in the declaration of Dr. Sanders, JHS does not employ a physical therapy staff and at most educates inmates on exercises to assist in healing and mobility.  (*Id*., ¶34.)  Inmates who require physical therapy must be referred out for services.  (*Id*.)  Dr. Sanders attests and the evidence shows JHS referred plaintiff to and plaintiff received physical therapy from HMC.  (*See, e.g.*, Dkt. 64 at 45 (November 15, 2016:  referral to HMC Physical Therapy (PT) for "work on gait training and strengthening exercises"); *id*. at 21 (November 29, 2016:  "Will try an increased dose of gabapentin at bed time to aid in pain control.  Will otherwise wait for further guidance from HMC PT and HMC Ortho.  [Patient] is agreeable to this plan and felt reassured."); *id*. at 27 (December 2, 2016:  "[Inmate] returns from HMC PT Appt.  See HMC Notes.  F/U in 4 week.  Sent Exercise sheet – copy made for [inmate].") (case of text modified); *id*. at 29 (December 3, 2016:  "Reviewed PT record of instructions for rehab of R hip . . . .  They recommend monthly f/u sessions."); *id*. at 51 (December 4, 2016:  HMC PT appointment scheduled for January 3, 2017); and *id*. at 43, 49 (reflecting cancellation of one or more external PT and occupational therapy appointments scheduled to occur *after* plaintiff's transfer from KCCF on December 6, 2016).)  A referral to an

REPORT AND RECOMMENDATION
PAGE - 15

outside provider for a service not available at a correctional facility does not amount to deliberate indifference, and the evidence contradicts plaintiff's conclusory allegation he was deprived of physical therapy.

The Court, in sum, finds an absence of significant and probative evidence and no genuine dispute of material fact as to whether the JHS defendants engaged in objectively unreasonable conduct in relation to plaintiff's serious medical needs. Plaintiff's claims against these individuals should be dismissed.

B.    DAJD Defendants

Plaintiff names the following DAJD transport officers as defendants: Thomas Brown, Manginder Chana, Yukio Kumura, Norman Walton, Peter Fischer, Lee McClelland, Chad Lengyel, Eric Burrows, Gary Towne, Lawrence Leimbach, Sonya Weaver, Michael Goodman, Michael Garcia, Lawrence Reis, Steven Spadoni, and Cameron Walker (hereinafter "transport officers"). (Dkt. 79 at 3; *see also id.* at 63-69.) He appears to allege both deliberate indifference and excessive force, or "assaultive acts," by failing to transport him via cabulance, forcing him to ambulate on his right leg, crawl into transport vehicles without assistance, and endure transport without a restraint device, as well as false imprisonment during transport. (*Id.* at 6-11, 43-46.)[3] Defendants construe plaintiff's Amended Complaint as alleging deliberate indifference to his

---

[3] Plaintiff included within his Amended Complaint a request for the names of the officers responsible for his transfer from HMC to KCCF on November 17, 2015. (*See* Dkt. 79 at 20.) Although plaintiff conducted discovery after filing the amended pleading, it is not clear whether he ever directed a discovery request for this specific information to defendants. (*See, e.g.*, Dkt. 149 (order directing response to belatedly submitted request for discovery related to kites and grievances).) Plaintiff did not seek to further amend his complaint to identify the transport officers responsible for his initial transport to KCCF, provide any evidentiary support for a claim associated with that transport, or provide any response to the dispositive motion. This matter has now been pending for some two-and-a-half years, and the Court has afforded plaintiff ample time and opportunity to identify defendants, facts, and evidence supporting his claims. Having failed to take the opportunity in relation to a claim addressing his initial transport to KCCF, the undersigned finds no basis to address such a claim.

serious medical needs and excessive force by the Transport Officers.

  1. <u>Medical deliberate indifference</u>:

  Gordon Karlsson, the DAJD Facility Commander of KCCF, attests that neither he, nor the transport officers who serve under his command work for JHS or have any decision-making power in the provision of medical or psychiatric care, other than to request JHS services for inmates if needed. (Dkt. 159, ¶¶4-5.) DAJD transport officers follow medical recommendations of JHS staff in making a decision on whether or not to order a cabulance for inmate transport. (*Id.*, ¶6.) Karlsson echoes the assertion of Dr. Sanders that JHS recommends transport via cabulance for inmates confined to a wheelchair or gurney, but not inmates utilizing crutches, canes, or walkers. (*Id.*) Karlsson attests that, although plaintiff requested transport to medical appointments via cabulance, JHS staff advised a cabulance was not medically necessary. Karlsson adds that transport officers nonetheless occasionally afforded plaintiff and others courtesy use of a wheelchair, despite the absence of a medical need, for purposes of efficiency and convenience. (*Id.*, ¶7.)

  JHS, not the transport officers, bore the responsibility for making medical decisions regarding transport. JHS made decisions regarding plaintiff's mobility and need for assistive devices in accordance with the findings and recommendations of HMC. Plaintiff does not identify evidence showing the transport officers failed to comply with medical recommendations or decisions of JHS or HMC, either at the time plaintiff remained confined to a wheelchair or after a wheelchair was no longer medically necessary. Nor does plaintiff provide more than a conclusory allegation he suffered injury as a result of his transport to and from HMC. The Court therefore finds an absence of evidence the transport officers were deliberately indifferent to plaintiff's serious medical needs.

REPORT AND RECOMMENDATION
PAGE - 17

The undersigned also herein addresses questions raised earlier in these proceedings in regard to an incident on November 21, 2016. (Dkt. 76 at 3; *see also* Dkt. 68 at 4, n.2.) On that date, plaintiff was unable to attend an HMC Ortho follow-up appointment because a prerequisite CT scan had been erroneously scheduled for December 12, 2016, and the appointment was canceled because one or more DAJD transport officers refused to deviate from their schedule to accommodate a delay to obtain a CT scan. The Court granted plaintiff leave to amend to obtain the names of the transport officers and pursue claims associated with this and other incidents. (*Id.*) Yet, while identifying individuals involved in his transport, plaintiff did not address this particular incident in his Amended Complaint. (*See* Dkt. 79.) There is no allegation the CT scan and follow-up appointment were not rescheduled, or that the delay resulted in injury or harm to plaintiff. The mere fact transport officers refused to deviate from their schedule and that that refusal delayed plaintiff's appointment does not demonstrate deliberate indifference to serious medical needs. *See, e.g., Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) ("[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference; even if Shapley were aware that surgery had been recommended . . . , he would have had no claim for deliberate medical indifference unless the denial was harmful.") (citing *Estelle*, 429 U.S. at 106). As such, assuming plaintiff intended to allege deliberate indifference in relation to this incident, the Court finds defendants entitled to summary judgment.

2.    Excessive force:

Defendants assert plaintiff's failure to exhaust administrative remedies in relation to an excessive force claim. Pursuant to the Prison Litigation Reform Act (PLRA): "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

REPORT AND RECOMMENDATION
PAGE - 18

1  remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The exhaustion requirement

2  "applies to all inmate suits about prison life, whether they involve general circumstances or

3  particular episodes, and whether they allege excessive force or some other wrong."  *Porter v.*

4  *Nussle*, 534 U.S. 516, 532 (2002).  It applies to both prisoners and pretrial detainees.  *See, e.g.*,

5  *Panaro v. City of North Las Vegas*, 432 F.3d 949, 950, 952 (9th Cir. 2005).  Exhaustion is

6  mandatory. *Jones v. Bock*, 549 U.S. 199, 211-12 (2007). It must be "proper" and include

7  compliance with a prison's grievance procedures.  *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-

8  93 (2006).

9       KCCF provides for both non-medical and medical grievances.  (Dkt. 159, Ex. A at 35-36.)

10  A non-medical grievance may address facility conditions, problematic conduct or actions by staff

11  members or other inmates, and operational procedures and practices, while a medical grievance

12  regards health services or medical issues.  A non-medical grievance must be submitted within

13  fourteen days of the incident being grieved.  (*Id.*, ¶10 and Ex. A at 35.)  An inmate must first talk

14  to a DAJD staff member and try to resolve the issue informally.   If there is no resolution, an inmate

15  must submit a grievance form.  (*Id.*, ¶10 and Ex. A at 36.)  A supervisor reviews and responds to

16  the grievance within ten days.  If the inmate disagrees with the written response, the inmate may

17  appeal the response to an administrator, who will respond to the appeal within twenty days.  For a

18  medical grievance, an inmate submits a Medical Grievance Form to a nurse during triage, receives

19  a response from JHS staff within ten business days, may appeal that response to a JHS supervisor,

20  and receives a response to an appeal within ten days.  (*Id.*, Ex. A at 36.)

21       Commander Karlsson attests plaintiff did not submit a grievance alleging an assault by a

22  transport officer.  (*Id.*, ¶¶11-12.)  The only non-medical grievance plaintiff submitted during his

23  KCCF confinement regarded law library access.   (*Id.*, ¶12 and Ex. B.)  Plaintiff did, in one of at

REPORT AND RECOMMENDATION
PAGE - 19

least nineteen medical grievances, address the failure to provide him with transport by cabulance. (Dkt. 158, ¶¶32, 36.)  In that grievance, filed on October 11, 2016, plaintiff asked why he had not been transported via cabulance on November 30, 2015, February 8, 2016, and May 9, 2016.  (*Id.*, Ex. A.)  He described being "forced to ride in a regular trans-port van, and sit on the floor, then slide myself backwards", not strapped in or secured with a seat belt, resulting in "immense pain moving, shifting, up & down steps of van to & from" HMC.  (*Id.*)  In the written response, a JHS staff member stated a cabulance was not indicated given plaintiff's use of crutches to ambulate. In his appeal, plaintiff asked whether his use of crutches meant he did not need a cabulance, whether transport officers were supposed to help him into the transport van, and whether he should have been in a cabulance or on crutches if he was under orders to be non-weight bearing.

Plaintiff did not exhaust his claims against the transport officers.  He did not grieve an assault or use of excessive force, or file any non-medical grievance challenging an act or omission of a transport officer.  He filed a medical grievance addressing the medical decision to not require his transport by cabulance.  Exhaustion serves two main purposes:  (1) to protect "administrative agency authority" by giving an agency the opportunity to correct mistakes with programs administered and discourage disregard of agency procedures; and (2) to promote efficiency because claims can generally be resolved more quickly and economically at the administrative level.  *Woodford*, 548 U.S. at 89-90.  In this case, plaintiff did not provide any opportunity for resolution of his claims against the transport officers at the agency level.

Nor did plaintiff file the grievance in proximity to the transport incidents.  He waited almost a year after the initial transport identified in the grievance, and five months after the most recent transport identified.  He also initiated the grievance procedure only *after* he filed his complaint. (Dkt. 1-1 (original complaint docketed October 3, 2016 and includes transport allegations)).)

REPORT AND RECOMMENDATION
PAGE - 20

Exhaustion must occur *prior* to filing suit. *McKinney v. Carey*, 311 F.3d 1198, 1199-1201 (9th Cir. 2002). *Cf. Rhodes v. Robinson*, 621 F.3d 1002, 1006-07 (9th Cir. 2010) (if filing an amended complaint adding new claims based on incidents that occurred after filing of original complaint, plaintiff need only show exhaustion of new claims before filing of amended complaint). Plaintiff's belatedly filed medical grievance would not serve to exhaust his administrative remedies in relation to excessive force or any other claim raised against the transport officers.

Moreover, even a properly exhausted claim regarding transport would face dismissal. To prevail on an excessive force claim, a pretrial detainee must show "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466, 2470, 2473, 192 L. Ed. 2d 416 (2015).[4] Also, had plaintiff alleged a failure to protect his health and safety, he would have to show that, in the acts or omissions associated with his transport, a transport officer made an intentional decision that put plaintiff at risk of suffering serious harm, failed to take reasonable measures to abate that risk, and caused plaintiff injury. *Castro*, 833 F.3d at 1070-71. Plaintiff does not identify facts associated with an incident in which he was assaulted or subjected to the use of excessive force by a transport officer, the identity of a specific transport officer associated with such an event, or any evidence associated with an assault

---

[4] "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case,'" without regard to the officers' underlying intent or motivation. *Kingsley*, 135 S. Ct. at 2472-73 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court must weigh the circumstances from the viewpoint of a reasonable officer at the scene and "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S. Ct. at 2472-73 (source and internal quotation marks omitted). The non-exclusive list of factors potentially relevant to the assessment of reasonableness include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 2473 (citing *Graham*, 490 U.S. at 396).

REPORT AND RECOMMENDATION
PAGE - 21

or use of excessive force.  Nor does the record contain evidence of an injury or harm sustained as a result of acts or omissions of a transport officer.  (*See* Dkt. 158, ¶36.)  The bare allegation of harm in his pleadings and in the medical grievance submitted after he initiated this lawsuit would not suffice to prevent dismissal of his claims had they been properly exhausted.

　　　　3.　　<u>False imprisonment</u>:

　　　　Plaintiff alleges false imprisonment "due to an act of excessive abuse" to his person, when he "was imprisoned" and "deprived of his liberty right without pain and suffering or movement or . . . freedom to remain in place with transport safety devices and the assistance of his prosthetic device (a wheelchair)[.]" (Dkt. 79 at 10-11.)  This claim should be dismissed.  False imprisonment is the intentional confinement of another person unjustified under the circumstances.  *Kellogg v. State*, 94 Wash.2d 851, 856, 621 P.2d 133 (1980).  The existence of probable cause to arrest is a complete defense to an action for false imprisonment.  *McBride v. Walla Walla County*, 95 Wn. App. 33, 38, 975 P.2d 1029, *review denied*, 138 Wn.2d 1015, 989 P.2d 1137 (1999).  There is no dispute plaintiff was subject to lawful detainment, and a claim of false imprisonment is inapplicable to the circumstances alleged.[5]

C.　　<u>KCSO Defendants</u>

　　　　Plaintiff avers King County Sheriff John Urquhart and KCSO Captain Marcus Williams were responsible for the actions of DAJD and JHS staff at KCCF, and failed to properly process and investigate his medical grievances or to compel the administration of humane treatment.  (Dkt. 79 at 4, 12.)  Defendants note the absence of any evidence of interaction between plaintiff and

---

[5] Defendants also argue the DAJD transport officers and JHS defendants are entitled to qualified immunity.  Because the Court finds the claims subject to dismissal for the reasons stated above, it declines to address qualified immunity.

REPORT AND RECOMMENDATION
PAGE - 22

either Urquhart or Williams during plaintiff's KCCF confinement, and assert neither individual would properly be held responsible for the actions of DAJD or JHS staff. DAJD, not KCSO, has jurisdiction over the inmates in DAJD facilities and over DAJD employees. (*See* Dkt. 157, Exs. A & B (King County Code Sections 2.16.120 (describing responsibility over and duties of DAJD in relation to KCCF and other facilities) and 2.16.060(B) ("The department of public safety is responsible to keep and preserve the public peace and safety including the discharge of all duties of the office of sheriff under state law, except those duties relating to jails and inmates which are performed by other departments of county government."))  Commander Karlsson clarifies that Williams Hayes served as the Director of DAJD during the time of plaintiff's KCCF confinement, and that neither Urquhart, nor Williams were employed by DAJD or had any decision making or supervisory authority over DAJD employees or inmates. (Dkt. 159, ¶3.)

Plaintiff includes no more than conclusory allegations against Urquhart and Williams, unaccompanied by facts or evidence showing these individuals caused or personally participated in causing him harm. His claims against the KCSO defendants should be dismissed.

D.    <u>King County</u>

Plaintiff also names King County as a defendant. To impose municipal liability, plaintiff must show (1) a King County employee violated his constitutional rights; (2) King County has customs or policies that amount to deliberate indifference; and (3) those customs or policies were the moving force behind the employee's violation of plaintiff's constitutional rights. *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). *See also City of Canton*, 489 U.S. at 392 (municipal liability must reflect deliberate indifference to a constitutional right), and *Castro*, 833 F.3d at 1076 (citing Supreme Court's understanding that an objective standard necessarily applies to municipalities "for the practical reason that government entities, unlike individuals, do

1    not themselves have states of mind.")

2         The Court originally allowed service on King County because plaintiff appeared to allege

3    a constitutional violation through one or more municipal policies or practices, such as acts or

4    omissions occurring as a result of "'pre-trial needs.'"  (Dkt. 5 at 3.)  He later appeared to identify

5    policies or customs of (1) overlooking the First Amendment right to grieve medical treatment; (2)

6    treating an inmate as a nuisance, rather than as a patient; (3) failing to follow prescribed physical

7    therapy; and (4) providing deficient care.  (Dkt. 63 at 8-11.)  The undersigned found this appeared

8    to reflect a mere re-packaging of alleged acts or omissions of then unidentified individual King

9    County employees as general policies or customs of King County, rather than the identification of

10   actual policies or customs, and the claim of municipal liability no more than conclusory and

11   contradicted by the evidence.  (*See* Dkt. 65 at 11-12 (citing *Trevino v. Gates*, 99 F.3d 911, 918

12   (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic

13   incidents; it must be founded upon practices of sufficient duration, frequency and consistency that

14   the conduct has become a traditional method of carrying out policy."); Dkt. 48; and Dkt. 64 at 13-

15   69)).

16        Plaintiff does not, in his Amended Complaint, identify an unconstitutional custom, policy,

17   or practice on the part of King County that deprived him of a clearly established constitutional

18   right.  At most, plaintiff appears to allege King County is "liable and responsible" for KCCF "staff

19   and operations" and "medical safety."  (Dkt. 79 at 4.)  As stated above, a municipality cannot be

20   held liable under § 1983 solely because it employs a tortfeasor.  *Monell* 436 U.S. at 691-94.  Nor

21   does plaintiff otherwise establish municipal liability by showing the violation of his constitutional

22   rights by a King County employee, King County customs or policies amounting to deliberate

23   indifference, and that such customs or policies were behind the constitutional violation.  *See Long*,

REPORT AND RECOMMENDATION
PAGE - 24

442 F.3d at 1186.  Plaintiff's claims against King County should be dismissed.

CONCLUSION

The Court recommends the unopposed Second Motion for Summary Judgment (Dkt. 155) filed by the King County defendants be GRANTED, and this case DISMISSED with prejudice.  A proposed order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 12, 2019**.

Dated this 21st day of March, 2019.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 25